# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 12, 2021

Lyle W. Cayce
Clerk

No. 20-20572

IN THE MATTER OF: WALKER COUNTY HOSPITAL CORPORATION

*Debtor*,

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF WALKER COUNTY HOSPITAL CORPORATION, *doing business as* HUNTSVILLE MEMORIAL HOSPITAL,

*Appellant*,

*versus*

WALKER COUNTY HOSPITAL DISTRICT; HUNTSVILLE COMMUNITY HOSPITAL, INCORPORATED,

*Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CV-911

Before JOLLY, DUNCAN, and OLDHAM, *Circuit Judges*.

E. GRADY JOLLY, *Circuit Judge*:

A creditor disputes last-minute modifications to the terms of a bankruptcy sale. Because it failed to seek a stay, its appeal fails.

No. 20-20572

## I.

Walker County Hospital Corporation (the "Hospital" or the "Debtor") operated a not-for-profit community hospital in Huntsville, Texas.[1] It is the county's largest healthcare provider; to be sure, few other options exist for residents in this rural area. The Hospital had financial troubles and was on the brink of closing, a matter of great concern to the citizens of Walker County. On November 11, 2019, the Hospital filed for Chapter 11 bankruptcy and made an effort to auction off its assets and operations. But none of the thirty-six parties that received the Hospital's offering memorandum submitted a bid.

But the Hospital did have some hope: a "stalking horse bid"[2] from Huntsville Community Hospital, a joint venture between Walker County Hospital District (the "District") and Community Hospital Corporation (collectively, the "Buyers"). At approximately the same time that the Buyers' bid was being organized and considered, a committee was appointed to represent the interests of the Debtor's unsecured creditors (the "Committee" or the "Creditors"). The Committee believed the Buyers' bid undervalued what the Hospital was worth and would have left little for the Creditors (i.e., the Committee). After weeks of negotiation, the Debtor, the Buyers, and the Committee reached a Settlement that would govern the sale of all of the Hospital's assets and operations to the Buyers. In exchange,

---

[1] As the facts are not in dispute, the factual discussion in the district court's order is relied on here.

[2] "[A]n initial bidder" in a bankruptcy proceeding may "serve as a so-called 'stalking horse,' whose initial research, due diligence, and . . . bid may encourage later bidders." *In re ASARCO, L.L.C.*, 650 F.3d 593, 602 (5th Cir. 2011). "[T]he initial offeror provides a valuable service by establishing a minimum price for the assets to be sold and in creating a market for the assets." WILLIAM L. NORTON, 2 NORTON BANKR. L. & PRAC. § 44:28 (3d ed. 2021) [hereinafter "NORTON"].

the Committee agreed not to bring its objections. This Settlement was memorialized in an email exchange between the parties on December 18, 2019. Two days later, the bankruptcy court held a hearing to approve the sale on the agreed terms and subsequently entered a Sale Order pursuant to 11 U.S.C. § 363(b), which attached and referenced the Settlement reached among the parties as well as a Purchase Agreement between only the Debtor and the Buyers.

Key features of these documents would later form the basis for this dispute. As noted above, the Committee agreed to waive its objections to the sale based on the terms agreed to in the Settlement. In exchange, the Committee received more favorable terms of sale for the Debtor than originally contemplated by the transaction. This would, of course, translate into more funds being available to flow from the Debtor to the Committee— i.e., to pay off unsecured creditors.

In exchange for less favorable terms, the Buyers retained certain rights. First, the Buyers' bid was conditioned on raising financing from a third-party lender (the "Lender"); without such financing, the Buyers were not obligated to consummate the transaction. Second, the Hospital was slated to receive a large future payment associated with a certain Medicaid program; the Buyers scheduled the transaction's closing date such that that payment was supposed to be received after they owned all of the Hospital's assets—including its accounts receivable—meaning that the Buyers would be entitled to receive that payment. However, if the sale closed after the Hospital received the payment from Medicaid, the payment would be included in an "Accounts Receivable Sharing Waterfall," a complex formula devised to divide the Hospital's accounts receivable between the Buyers and the Debtor's estate (that would eventually flow to the Committee). In short, if the payment reached the Hospital before the sale closed, the Buyers would receive substantially less than expected.

No. 20-20572

After the Sale Order was entered, the Lender began its due diligence process, reviewing the Hospital's records to determine if it was willing to finance the Buyers' acquisition of the Hospital. The process was slow, issues were found, and closing was delayed past the date originally planned. During this period of delay, the Buyers and the Hospital negotiated some side agreements to keep the Hospital running, since it was very close to shutting its doors due to financial difficulties. As part of these side agreements, the Buyers conditioned their ability and willingness to close the transaction on the Hospital's having not yet received the Medicaid payment; the Buyers did not want to lose that asset because of the delay.

The Lender remained unwilling to finalize financing for the Buyers' acquisition before finishing its diligence on the Hospital—when on or about February 25, 2020, the Hospital received the Medicaid payment. The sale had not yet closed. The Buyer informed the Debtor that losing the Medicaid payment would sink its ability to receive financing to close the transaction.

On February 26, 2020, the Debtor filed an emergency motion in bankruptcy court seeking to amend the Sale Order. In it, the Debtor noted the side deals that had been reached between the Debtor and the Buyers to keep the hospital running and also explained about the delayed closing, the Medicaid payment, and the need for financing. The Debtor asked the court to adjust downward the purchase price the Buyers would be paying and also grant the Buyers an administrative expense claim (which would, in effect, also decrease the sale price for the Buyers). According to the Debtor, this compromise constituted the agreement the Debtor and the Buyers had reached to allow the transaction to still go forward. Without it, there would be no deal, and the hospital would have to cease operations. The Debtor thus claimed that the relief it sought was "in the best interests of the Debtor, its

estate, creditors, and all parties in interest."[3]     Because "timely consummation of the sale" was of "critical importance," the Debtor also asked the court to waive the standard fourteen-day stay usually required by Federal Rule of Bankruptcy Procedure 6004(h). FED. R. BANKR. P. 6004(h) ("An order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, *unless the court orders otherwise*.") (emphasis added).

The Debtor filed its motion on February 26, 2020, at 8:42 a.m., and the Committee acknowledges receiving notice "shortly after." Indeed, the Committee says that its counsel called the bankruptcy court to inform the court that it objected to the motion and wanted time to confer with the Debtor and the Buyers, but this evidence does not appear in the record. What is in the record is that one of the Buyers filed a joinder to the Debtor's motion the next day, stating that the "Buyers will not be able to close this transaction without the relief sought in the Debtor's Emergency Motion." And that same day, February 27, 2020, at 9:20 a.m.—about twenty-four hours after the Debtor's motion was filed—the bankruptcy court entered an order amending the Sale Order (the "Amendment Order") and granted the Debtor and the Buyers the relief they had requested.

The Amendment Order was "effective immediately upon its entry," and it authorized the Debtor and the Buyers to "close the sale of the Purchased Assets immediately." It also was explicit that "[a]ny party objecting to this order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing Date, [sic] or risk its appeal will be foreclosed as moot." That did not leave

---

[3] The Debtor also noted, however, that it "sought the Committee's consent to the relief sought in this Motion prior to filing this Motion, but such consent was not obtained."

much time, because less than twenty-four hours later, the sale of the Hospital's assets closed—at 12:01 a.m. on February 28, 2020.

The Committee did not seek a stay at any point, but about two weeks later, on March 11, 2020, it did appeal the bankruptcy court's Amendment Order to the district court, claiming various bankruptcy rules were not followed and that its procedural due process rights were violated. The Buyers moved to dismiss the Committee's appeal. They argued it was mooted by 11 U.S.C. § 363(m), which provides that the "modification on appeal" of certain authorized bankruptcy sales "does not affect the validity of" such a sale "to an entity that purchased . . . such property in good faith . . . unless" that sale was "stayed pending appeal." 11 U.S.C. § 363(m). Since the Committee did not even seek a stay, the Buyers argued that the sale could not be modified.

The District Court ruled that the Committee's appeal was statutorily moot.[4] It did not address the Committee's due process arguments.

This appeal by the Committee followed.

## II.

"In reviewing the rulings of . . . the district court sitting in bankruptcy, we review findings of fact for clear error and conclusions of law de novo." *In re TMT Procurement Corp.*, 764 F.3d 512, 519 (5th Cir. 2014). "We review mixed questions of law and fact de novo." *Id.*

---

[4] The district court also found that the Creditors' appeal was equitably moot. Equitable mootness is a judge-created bankruptcy doctrine that "allows courts to abstain from appeals" of orders confirming bankruptcy plans. *In re Sneed Shipbuilding, Inc.*, 916 F.3d 405, 408 (5th Cir. 2019). But there was no bankruptcy plan ever proposed in this case, let alone a plan confirmation order, so the doctrine of equitable mootness cannot apply. *Id.* at 409.

No. 20-20572

### III.

The district court held that the Committee's appeal was statutorily moot under 11 U.S.C. § 363(m), which provides that the "modification on appeal" of a "sale . . . of property" authorized under § 363(b) "does not affect the validity of" such a sale "to an entity that purchased . . . such property in good faith . . . unless" that sale was "stayed pending appeal." 11 U.S.C. § 363(m). The purpose of § 363 is to "promote the finality of bankruptcy sales[,] thereby maximizing the purchase price of estate assets." NORTON § 44:37. "Without this protection, potential appeals would create such uncertainty that it could chill bidding on the debtor's assets." *Id.* And ultimately, maximizing bidding on and the purchase price for a debtor's assets benefits a debtor's creditors. As this court noted in *Bleaufontaine*:

> If deference were not paid to the policy of speedy and final bankruptcy sales, potential buyers would not even consider purchasing any bankrupt's property. As a result, the bankrupt's creditors would be the ones most injured thereby. The public has a keen interest in protecting such creditors. Otherwise, financing might become a thing of the past.

*In re Bleaufontaine, Inc.*, 634 F.2d 1383, 1389 n.10 (5th Cir. 1981). "The cost, of course, is disposing of . . . full judicial review for legal accuracy that typically follows a trial court's ruling. But Congress thought that trade was worth making to encourage buyers to come to the table." *Sneed Shipbuilding*, 916 F.3d at 409–10.

This court's interpretation of § 363(m)—which follows directly from the text of the statute—is clear: "[A] failure to obtain a stay is *fatal* to a challenge of a bankruptcy court's authorization of the sale of property." *In re Ginther Trusts*, 238 F.3d 686, 689 (5th Cir. 2001) (emphasis added). And fatal means fatal: challenges to authorized bankruptcy sales are dismissed

7

when the party challenging the sale has not sought a stay. This result is made unmistakable by our precedent.

For example, four decades ago, a debtor wanted to make a deal to lease property to provide crucial finances as it went through a Chapter 11 bankruptcy. *Am. Grain Ass'n v. Lee-Vac, Ltd.*, 630 F.2d 245, 247 (5th Cir. 1980). "[T]ime was of the essence" to close the leasing transaction. *Id.* A creditor objected to the lease, but the bankruptcy court approved it over the objection, and the lease agreement was consummated. *Id.* The creditor appealed the bankruptcy court's order to this court. *Id.* It did not, however, seek a stay. *Id.* This court held that "[i]n the absence of a stay of a bankruptcy court's order . . . a party appealing the order will not be heard to affect the rights of a third party" who acquired the property through the lease. *Id.* at 248. "Under such circumstances, the appeal will be dismissed as moot." *Id.* at 247.

A few years later, a creditor attempted to assert ownership of property that was part of a bankruptcy proceeding; the bankrupt wanted to sell the property to a buyer. *Fabrique, Inc. v. Corman*, 813 F.2d 725, 725 (5th Cir. 1987). The bankruptcy judge allowed the sale. *Id.* The creditor appealed that decision but failed to seek a stay. *Id.* The appeal was "dismissed as moot, as 11 U.S.C. § 363(m) . . . placed [the buyer's] purchase beyond challenge." *Id.*

Just three years after *Fabrique*, a bankruptcy court "entered an order approving the sale of certain assets," which a party "did not obtain a stay [of] pending appeal to the district court." *In re Gilchrist*, 891 F.2d 559, 560 (5th Cir. 1990). When the appeal reached this court, the panel was resolute: "Section 363(m) patently protects, from later modification on appeal, an authorized sale where the purchaser acted in good faith and the sale was not stayed pending appeal." *Id.* As such, "in the absence of a stay," the appeal

is moot, and a party "cannot be heard to complain at this late date." *Id.* at 560–61.

Only two years ago in *Sneed Shipbuilding*, a trustee attempted to block a bankruptcy court's approval of a sale of key estate assets, and we "conclude[d] that section 363(m) made the bankruptcy court's approval the final word on the subject when the objector did not obtain a stay of that ruling." *Sneed Shipbuilding*, 916 F.3d at 407. We reasoned that since "Congress ha[d] ordered [it] not to review such decisions by the bankruptcy court when they are not stayed," the case was moot. *Id.* at 410.

## IV.

The Committee, however, makes two interrelated arguments in an attempt to skirt § 363(m)'s bar. First, it notes that it only appealed the Amendment Order, not the Sale Order. Second, although the Sale Order was rendered pursuant to § 363(b), the Amendment Order did not mention that subsection or § 363(c), which are the only two subsections that authorize sales to which § 363(m) applies. Because the Committee did not appeal the Sale Order, and because the Amendment Order was not pursuant to § 363(b), the Committee argues that the lower court erred in applying § 363(m).

The Committee is correct when it asserts that the Amendment Order did not mention § 363(b). But the Amendment Order never purported to authorize a new or different sale; it only amended the Sale Order based "upon all of the proceedings had" before that court. One can clearly see this from looking at the titles of the two orders, which are nearly identical—the Amendment Order merely adds "Order Amending" to the title of the Sale Order. The Amendment Order, rather than being a discrete decree, was integrally linked to, and indeed, inseparable from, the Sale Order.

What's more, this court previously has encountered these sorts of arguments in this same context. For example, in *American Grain*, the creditor

argued that § 363(m) should not apply because it contested an order about a lease, not a sale of property. *Am. Grain Ass'n*, 630 F.2d at 248. The panel held that "such a strict reading of the rule would . . . undermine the important policy of affording finality to lower court judgments in bankruptcy proceedings." *Id.* A creditor made a similar argument in *Sneed Shipbuilding*, saying that it did not challenge the sale of the property but rather the cash disbursement that happened as part of that sale and a related settlement. *Sneed Shipbuilding, Inc.*, 916 F.3d at 410. In response, this court stated that it could not perform an "isolated analysis," given that the payment was an "essential feature of the sale." *Id.* The court went on to note that because the arrangements were "mutually dependent" and could not be "sever[ed]," the creditor's argument was unavailing. *Id.*

Thus, *American Grain* and *Sneed Shipbuilding* control here.[5] The Amendment Order does just that—it amends the Sale Order—and therefore cannot be separated from it, just as the lease in *American Grain* and the cash disbursement in *Sneed Shipbuilding*. The Committee's contentions are therefore unavailing.[6]

---

[5] We note one case that appears, at first glance, to support the Committee's position: *In re Energytec, Inc.*, 739 F.3d 215 (5th Cir. 2013). But in that case, the bankruptcy court specifically reserved for later determination an issue that arose as part of a sale; this court found a later ruling on that issue to be separately appealable from the sale order and not moot. *Id.* at 219 & nn.2–3, 221. Here, the bankruptcy court did not reserve any questions for later determination: the Amendment Order's sole purpose was to modify the Sale Order so that the parties would fully consummate the sale. Nothing was left on the table. *Energytec* is thus inapposite.

[6] The Committee also argues that its procedural due process rights were violated by the manner in which the bankruptcy court handled the Debtor's motion to amend and the Amendment Order; that is, the short time frame in which the Committee had to seek a stay. Having decided this appeal on statutory mootness grounds, we will not address these arguments. *Cf. TMT Procurement Corp.*, 764 F.3d at 520 (noting that "[c]onsistent with our precedent" the court "d[id] not reach" another issue in a bankruptcy appeal "before deciding the statutory mootness issue" because of the party's "failure to obtain a stay

No. 20-20572

## V.

In this opinion, we have held that § 363(m) forecloses the creditor's appeal because it failed to seek the required stay of the Sale Order. Established precedent leads us to this conclusion, and the Committee's argument that it appealed an order not subject to § 363(m) is unpersuasive. In short: no stay, no pay.

AFFIRMED.

---

pending appeal"). Nor will we pass on the Committee's contentions regarding the other parties' good faith or the awarding of damages, as the Committee did not make these arguments until its district court appeal reply brief. Since "arguments raised for the first time in a reply brief are waived," *United States v. Gas Pipe, Inc.*, 997 F.3d 231, 242 (5th Cir. 2021), the district court—as an appellate court, in this bankruptcy case—rightfully did not consider these arguments.